# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION AT DAYTON

**SASC, LLC,** *doing business as* **Activate Learning,**

      *Plaintiff, Counterclaim Defendant,*

**v.**                                         **Case No. 3:23-cv-083**
                                                 **Judge Thomas M. Rose**

**School Supply Connection, Inc.,** *et al.*,

      *Defendants, Counterclaim Plaintiffs.*

---

**ENTRY AND ORDER GRANTING PLAINTIFF'S MOTION FOR LEAVE TO FILE AMENDED COMPLAINT, (DOC. 76), GRANTING PLAINTIFF'S MOTION TO DISMISS DEFENDANTS' AMENDED COUNTERCLAIM, (DOC. 83), AND GRANTING DEFENDANTS TEN DAYS TO FILE AN ADDENDUM TO MEMORANDA RELATING TO PENDING MOTIONS THAT PROVIDES PINPOINT CITATIONS.**

---

Pending before the Court are Plaintiff's Motion for Leave to File Amended Complaint, (Doc. 76), and Plaintiff's Motion to Dismiss Defendants' Amended Counterclaim. (Doc. 83.) The case stems from allegations by Plaintiff, SASC, LLC d/b/a Activate Learning's (hereinafter "SASC" or "Activate Learning") that Defendants Timothy Peyton and Defendant School Supply Connection's ("SSC") represented to Plaintiff that they needed significant cash advances in order to fulfill contractual obligations, received such cash advances, and then absconded with the money. For their part, Defendants seek to assert counterclaims that allege shortcomings in

1

Plaintiff's performance of duties under and surrounding the contract. In the first motion, Plaintiff seeks to add claims of negligent misrepresentation and fraud in the inducement. Defendants, after seeing the Court dismiss all but one of their original counterclaims—and having been warned in the process of the potential of sanctions should they frivolously persist in asserting counterclaims unsupported by factual allegations that would entitle them to remedies if they should be proven true—seek again to assert a variety of counterclaims. Because these claims continue to lack allegations of fact that would entitle Defendant to legal or equitable remedies, Plaintiff's Motion to Dismiss Defendants' Amended Counterclaims will be granted.

## I. Background

Activate Learning alleges that SSC is a "supplier and reseller of school supplies and educational materials, including the Educational Products supplied on behalf of [Activate Learning]." (Doc. 76-1, at ¶9.) Timothy Peyton allegedly owns and operates SSC as its sole shareholder. (*Id.* at ¶4.) Activate Learning alleges that APlus is another entity operated and controlled by Peyton and/or SSC. *(Id.* at ¶4.)

On March 6, 2020, Activate Learning and SSC allegedly entered into a vendor agreement under which SSC agreed to deliver its educational products to customers for Activate Learning. (*Id.* at ¶10.) Activate Learning alleges that under the Agreement, SSC also agreed to purchase component parts, assemble, store, and fulfill orders of prepackaged educational material for Activate Learning. (*Id.* at ¶14.)

From 2021 to June 2022, Activate Learning advanced a total of $4,565,000 to SSC so that SSC could in turn purchase materials for Activate Learning's benefit. (*Id.* at ¶¶18-20.) Approximately $2.2 million of those advances were allegedly outstanding at the time of the filing of the Complaint. (*Id.* at ¶21.)

SSC allegedly issued IOUs to its customers for materials it did not have in stock, while billing Activate Learning for deliveries to customers that consisted not of educational materials, but of IOUs. (*Id.* ¶22.)

Upon termination, Activate Learning claims it is entitled to buy from SSC the remaining inventory purchased using the Activate Learning advances. (*Id.* at ¶22.) Activate Learning alleges that it has requested on numerous occasions that SSC provide an inventory report detailing how much Activate Learning inventory remains in SSC's warehouse. SSC has allegedly refused to provide this inventory report and allegedly refused to allow Activate Learning to purchase back its materials. (*Id.* at ¶¶24, 26, 27.)

Activate Learning alleges that, instead, Peyton caused SSC to dispose of some of Activate Learning's materials by allegedly fraudulently transferring the materials to APlus in order to hinder or defraud Activate Learning. (*Id.* at ¶29.) Peyton and SSC allegedly concealed the fraudulent transfer from Activate Learning and allegedly fraudulently transferred the materials after Activate Learning threatened to sue SSC. (*Id.* at ¶30.) Peyton's and SSC's transfer of Activate Learning materials to APlus has allegedly allowed APlus, and Peyton or SSC indirectly, among other things, to resell Activate Learning's materials to APlus's customers. (*Id.* at ¶32.) Activate Learning has allegedly suffered damages as a direct result of the above allegedly unlawful conduct. (*Id.* at 54.)

On March 17, 2023, Activate Learning filed suit in this Court. (Doc. 1.) Plaintiff asserted four causes of action: (1) anticipatory breach of contract against SSC; (2) breach of contract against SSC; (3) replevin against SSC; and (4) fraudulent transfer under Section 1336.04, Ohio Revised Code, against SSC, Peyton, and APlus (Doc. 1). On May 9, 2023, Defendants answered the Complaint and filed their Counterclaim (Doc. 21).

On May 30, 2023, Activate Learning filed a Motion to Dismiss the Counterclaim (Doc. 26), Defendants filed their Memorandum in Opposition on June 19, 2023 (Doc. 34), and Plaintiff replied on July 24, 2023 (Doc. 43). On July 11, 2023, Defendants filed their Motion for Judgment on the Pleadings (Doc. 39–40), Plaintiff filed their response on August 1, 2023 (Doc. 46–47), and Defendant's replied on August 8, 2023 (Doc. 49–50).

On March 13, 2024, the Court denied Defendant's Motion for Judgment on the Pleadings (Doc. 39, 40); and granted in part and denied in part Plaintiff's Motion to Dismiss for Failure to State a Claim. (Doc. 26.) The Court dismissed all counterclaims except the first counterclaim for breach of a contract to pay bonuses. (Doc. 77.) The Court granted Defendants permission to amend their Counterclaim to replead their claims, "subject to the strictures of Fed. R. Civ. P. 11." (*Id*.)

Prior to the Court's order, Plaintiff filed its Motion for Leave to Amend Complaint. (Doc. 76.) On March 25, 2024, Defendants refiled their answer, renewing their counterclaims. (Doc. 79.) On April 8, 2024, Plaintiff moved the Court to dismiss the amended counterclaim. (Doc. 83.) Responses and replies have been filed, (Docs. 81, 84, 86, 88), rendering the matter ripe for decision.

## II. Standard

Under Rule 15(a) of the Federal Rules of Civil Procedure, leave to amend a complaint shall be freely given "when justice so requires." The factors that the Court should consider when determining whether to grant a motion for leave to amend are:

> Undue delay in filing, lack of notice to the opposing party, bad faith by the moving party, repeated failure to cure deficiencies by previous amendments, undue prejudice to the opposing party, and futility of amendment are all factors which may affect the decision. Delay by itself is not sufficient reason to deny a motion to amend.

4

> Notice and substantial prejudice to the opposing party are critical
> factors in determining whether an amendment should be granted.

*Wade v. Knoxville Utilities Bd.*, 259 F.3d 452, 458-59 (6th Cir. 2001) (*quoting Head v. Jellico Hous. Auth.*, 870 F.2d 1117, 1123 (6th Cir. 1989)).

Activate Learning moves under Federal Rule of Civil Procedure 12(b)(6) to dismiss each count in the Amended Counterclaim. (Doc. 83, PageID 2725.) To survive a motion to dismiss under Rule 12(b)(6), a challenged pleading "must contain sufficient factual matter, accepted as true, to 'state a claim of relief that is plausible on its face.' " *Ashcroft v. Iqbal*, 556 U.S. 66, 678 (2009) (*quoting Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the Plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556). A complaint need not contain "detailed factual allegations," but must provide "more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555). A pleading that offers "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555.

In considering whether a counterclaim meets the requisite standard to survive a motion to dismiss, the Court must construe the counterclaims in the light most favorable to the non-moving party "and accept all allegations as true." *Keys v. Humana, Inc.*, 882. F.3d 579, 588 (6th Cir. 2018). In other words, the court must draw all reasonable inferences in favor of the non-moving party. *See DirectTV, Inc. v. Treesh*, 487 F.3d 471, 476 (6th Cir. 2007). "The Supreme Court took pains to stress in both *Twombly* and *Iqbal* that what is required at the pleading stage is a plausible, not probable, entitlement to relief." *Erie Cnty., Ohio v. Morton Salt, Inc.*, 702 F.3d 860, 868 (6th Cir. 2012).

### III. Analysis

### A. Plaintiff's Negligent Misrepresentation Claim

Plaintiff Activate Learning seeks to add claims of negligent misrepresentation and fraud in the inducement against Defendants School Supply Connection, Inc. ("SSC"), and Timothy Peyton. (Doc. 76.) Both oppose the amendment, asserting that it would be futile. (Doc. 81.)

In Ohio, negligent misrepresentation is defined as:

> [o]ne who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

*Nat'l Mulch Seed Inc. v. Rexius Forest By-Prods.*, No. 2:02-cv-1288, 2007 WL 894833, at *5 (S.D. Ohio Mar. 22, 2007)(Holschuh, J.). To assert a negligent misrepresentation claim, "a plaintiff must establish that the defendant supplied false information for the guidance of the plaintiff in its business transactions, that the plaintiff was justified in relying on the information, and that the defendant failed to exercise reasonable care or competence in obtaining and/or communicating the information." *Id.* at *9.

Here, Activate Learning alleges that:

> SSC represented to SASC that SSC was unwilling and/or unable to purchase [Open Science Education] Kits to fulfill SASC [Open Science Education] Kit future orders and needed SASC to advance SSC funds in order to cover a portion of anticipated costs of materials . . . . Relying on those representations, SASC wired $1,330,000 (over four transactions) to SSC's business checking account. . . . Peyton, as SSC's owner, has admitted that SSC has very little [Open Science Education] Kits and/or materials in their current inventory, and bank records show that as of August 31, 2023, SSC's business checking account…had a closing balance of $10,552.55. . . . Peyton, as SSC sole owner, has complete control over SSC such that SSC has no separate mind, will, or existence of

> its own [and] used his complete control over SSC to make
> representations on behalf of SSC regarding how SSC was going to
> spend the [Open Science Education] Advances only on [Open
> Science Education] inventory . . . . Peyton never intended to only
> use the [Open Science Education] Advances only for [Open
> Science Education] inventory and instead intended to use the
> [Open Science Education] Advances, whether in whole or in part,
> for his personal use . . . .

(Doc. 76-1, PageID 1836, ¶¶ 63-73.)

Defendants argue that negligent misrepresentation in Ohio is limited to a special category of relationships. (Doc. 86, PageID 2840-41.) Defendants assert that in order to allege a claim for negligent misrepresentation, SSC must be in the business of supplying information and because it is not, it cannot have negligently misrepresented anything. (*Id.* at 2839-40.) However, "a special relationship is not a formal element of a negligent misrepresentation claim under Ohio law." *Nat'l Mulch Seed Inc.*, 2007 WL 894833 at *9. The more essential consideration is whether the "'defendant suppl[ied] false information for the guidance of the plaintiff in its business transactions.'" *Hodell-Natco Indus. V. SAP Am., Inc.*, 13 F. Supp. 3d 786, 797 (N.D. Ohio 2014) (*quoting Nat'l Mulch Seed*, at *9). When the limit associated with a special relationship is not applicable, all that is necessary then "'is for the maker of the representation [to] intend to reach and influence either a particular person or persons, known to him, or a group or class of persons, distinct from the much larger class who might reasonably be expected sooner or later to have access to the information.'" *Nat'l Mulch Seed*, at *10 (quoting Restatement (Second) of Torts § 552 cmt.H (1977)).

Here, Plaintiff Activate Learning alleges Defendants spoke directly to Activate Learning with the goal of entering a contractual relationship. (Doc. 76-1, PageID 1836, ¶¶ 64-65.) Defendant allegedly "intend[ed] to reach and influence…a particular person," *Nat'l Mulch Seed*, at *10, that person being Activate Learning.

Defendants also argue that negligent misrepresentation has no application in typical business transactions. (Doc. 86, PageID 2839-40.) However, "Ohio law does not…bar[] a cause of action for negligent misrepresentation because the defendant supplied information to guide the plaintiff in a business transaction with the defendant." *Nat'l Mulch Seed Inc*., 2007 WL 894833 at *11. "[A] broad rule [excluding typical business transactions] … contradicts the inclusion of liability for negligent misrepresentation when a person supplies false information 'in *any . . .* transaction in which he has a pecuniary interest.'" *Id.* (*quoting Delman v. City of Cleveland Heights*, 41 Ohio St.3d 1, 4 (1989) (emphasis in *Nat'l Mulch Seed*); see also *Meta v. Target Corp*., 74 F. Supp. 3d 858, 865 (N.D. Ohio 2015) (holding that misrepresentations must allege more than a misrepresentation to the public at large, "which may consist of supplying false information in a business transaction."). Therefore, Activate Learning's negligent misrepresentation claim would survive a motion to dismiss. The Court will allow amendment to plead the claim of negligent misrepresentation.

### B. Plaintiff's Fraud in the Inducement Claim

Defendants argue that Activate Learning's fraud in the inducement claim would not survive a motion to dismiss because it lacks allegations to support a duty to disclose and fails to allege a separate duty from its breach of contract claim. (Doc. 86, PageID 2842.) Activate Learning asserts it does not need to allege a duty because its fraud in the inducement claim is based on affirmative misrepresentations and further asserts that it has alleged a separate set of facts from the breach of contract allegations because the alleged misrepresentations were made to induce Activate Learning into entering into the contract, i.e., the statement of work calling for the large advances to Defendants. (Doc. 84, PageID 2822.)

In Ohio, to prevail on a claim of fraud in the inducement, a plaintiff must prove: 1) a representation; 2) material to the transaction; 3) made falsely, with knowledge of its falsity; 4) with the intent of misleading another into relying upon the false statement; 5) justifiable reliance on the representation; and 6) resulting injury proximately caused by such reliance. *Onyx Envtl. Servs., LLC v. Maison*, 407 F. Supp. 2d 874, 878 (N.D. Ohio 2005). An action based in fraud can come from affirmative misrepresentations or from a party failing to disclose facts when there was a duty to speak. *See Textron Fin. Corp. v. Nationwide Mut. Ins. Co.*, 115 Ohio App. 3d 137, 152 (Ohio Ct. App. 1996). No duty is required where there is an affirmative misrepresentation. *See Mulch Mfg. Inc. v. Advanced Polymer Solutions, LLC*, 947 F. Supp. 2d 841, 863 (S.D. Ohio 2013); *Republic Bank & Trust Co. v. Bear Stearns & Co., Inc.*, 683 F.3d 239, 254–55 (6th Cir. 2012) ("Fraud by omission is not the same, at law, as fraud by misrepresentation, and has substantially different elements . . . . Unlike fraud by misrepresentation, which hinges on an affirmative misstatement, 'a fraud by omission claim is grounded in a duty to disclose.'") (citations omitted)).

Here, Defendants argue that Activate Learning's fraud in the inducement claim would not survive a motion to dismiss because the contract arose out of an arm's length transaction that had no evidence of a fiduciary duty or special relationship between the parties. (Doc. 86, PageID 2842.) However, Activate Learning alleged that affirmative misrepresentations were made, which negates the need for Activate Learning to allege the existence of a duty. *Mulch Mfg.*, 947 F. Supp. 2d at 863. Activate Learning alleges that:

> [i]n the first quarter of 2022, SSC represented to SASC [Activate Learning] that SSC was unwilling and/or unable to purchase [Open Science Education] Kits to fulfill SASC [Open Science Education] Kit orders and needed SASC to advance SSC funds in order to fulfill SASC's [Open Science Education] program obligations. Those conversations were had between Peyton, on behalf of SSC,

9

> and Matthew Rosner and Eric Johnson, on behalf of SASC, by
> phone over several weeks and in the months preceding the first
> [Open Science Education] Advance in March 2022 . . . . Relying
> on those representations, SASC wired a total of $1,330,000 to
> SSC's business checking account…. However, Peyton, as SSC's
> owner, has admitted that SSC has very little [Open Science
> Education] Kits in their current inventory, and bank records show
> that as of August 31, 2023, SSC's business checking account
> …had a closing balance of $10,552.55 . . . . Peyton, as SSC's sole
> owner, made that representation on behalf of SSC to induce SASC
> into transferring the [Open Science Education] Advances so that
> Peyton could then spend the [Open Science Education] Advances
> as he saw fit for his or SSC's own purposes contrary to his specific
> representations to SASC.

(Doc. 76-1, at 1838-39; ¶¶ 74-88.) These allegations state a claim for relief which would survive

a motion to dismiss. SSC and Peyton allegedly made false representations leading up to—and

during the course of negotiating—the agreement between the parties. Activate Learning

allegedly reasonably relied on those misrepresentations to assess SSC's actual need for advance

payments. Finally, Activate Learning allegedly justifiably relied on Peyton's statements that

advances were necessary for SSC to purchase products, to Activate Learning's detriment.

Therefore, Activate Learning's allegations substantiate a cognizable claim for fraud in the

inducement and amendment will be granted.

Defendants also argue that Activate Learning cannot bring both a breach of contract

claim and a fraud in the inducement claim because both stem from the same facts and there is no

separate duty alleged. (Doc. 86, PageID 2843-44.) Defendants rely on *Telxon Corp.*, which held

that the tort-based claims at issue there were not separate from the breach of contract claims

because the misrepresentations were based on promises in the underlying contract. *See Telxon*

*Corp. v. Smart Media of Delaware, Inc.*, 2005 WL 2292800, at *13 (Ohio Ct. App., Sept. 21,

2005).

Generally, a "tort exists only if a party breaches a duty which he owes to another independently of the contract, that is, a duty which would exist even if no contract existed." *Eggert Agency, Inc. v. NA Mgmt. Corp.*, No. 2-07-cv-1011, 2008 WL 3474148, at *7 (S.D. Ohio Aug. 12, 2008)(Sargus, J.)(citations omitted). A plaintiff may plead both a breach of contract claim and fraud in the inducement claim because "the duty not to breach a contract is separate and independent from the duty not to deceive a party entering into an agreement or contract." *Kendell v. Shanklin*, 2:20-cv-985, 2020 WL 5300926, at *6 (S.D. Ohio Sep. 4, 2020)(Jolson, M.J.); *see Anderson v. Correll*, No. 5:19-cv-988, 2020 WL 1288800, at *12 n.16 (N.D. Ohio Mar. 18, 2020) (because the "common-law duty not to deceive a party into entering the contract or agreement is . . . independent and separate from a duty not to breach a contractual obligation . . . [p]laintiff can [ordinarily] maintain a fraud claim based on a theory of fraud in the inducement . . . alongside his breach of contract claim.") (citations omitted); *Eggert Agency, Inc.*, 2008 WL 3474148, at *7 (denying the defendants' motion to dismiss because the plaintiff's fraud in the inducement claim arose from conduct that occurred prior to contract formation).

However, the fraud in the inducement allegation asserts misrepresentations made before contract formation to induce contract formation. Even if the advances were later written into the agreement, this would not absolve fraudulent inducements to do so. Activate Learning alleges that Defendants made misrepresentations that they needed advance payments in order to fulfill the program obligations and that these misrepresentations induced Activate Learning into entering into this statement of work that call for the advances. The claim is thus based on pre-contractual misrepresentations.

Defendants also argue that Activate Learning cannot bring a fraud in the inducement claim because the allegations concern future actions or conduct. (Doc. 86, PageID 2844-45

(citing *Tibbs v. Nat'l Homes Const. Corp.*, 52 Ohio App. 2d 281 (Ohio Ct. App. 1977)).

However, *Tibbs*, clarifies:

> [s]ometimes referred to as an exception to this rule although in reality simply an application of the rule to extended facts is the instance of the malefactor who makes his promise of future action, occurrence, or conduct, and who at the time he makes it, has no intention of keeping his promise. In such case, the requisite misrepresentation of an existing fact is said to be found in the lie as to his existing mental attitude and present intent.

*Id.* at 287. Activate Learning alleges that "Peyton never intended to use the OSE Advances only for OSE inventory and instead intended to use the OSE Advances for personal use." (Doc. 76-1, PageID 1839, ¶ 72.) This allegation falls within the exception of future conduct because Peyton allegedly had "no intention of keeping his promise." *Eggert Agency, Inc.*, 2008 WL 3474148 at *7. Therefore, the fraud in the inducement claim can remain in conjunction with the breach of contract claim because a separate duty is adequately addressed.

Defendants finally allege that Activate Learning provides no "evidence" that the fraud in the inducement claim seeks damages beyond those sought for the breach of contract claim. (Doc. 86, PageID 2845.) At this stage, all that is required is a "short and plain statement." *Eggert Agency, Inc.*, 2008 WL 3474148 at *7. Activate Learning alleges that "[a]s a direct result of SSC and Peyton's misrepresentations, Activate Learning has been damaged," and requests "damages in an amount no less than $1.1 million." (Doc. 86, PageID 1840.) Activate Learning states "that [they] seek to recoup a sum of money, but may attempt to seek an amount in excess of their contractual damages." *Eggert Agency, Inc.*, 2008 WL 3474148 at *7. Therefore, Defendants' argument is premature and does not bar amendment of the complaint.

## C. Unjust Enrichment

Defendants argue that Activate Learning cannot bring an unjust enrichment claim because (1) there is an express contract that is undisputed and (2) Activate Learning has not properly pierced the corporate veil to hold Peyton individually liable. (Doc. 81, PageID 2500, 2509.)

To prevail under the theory of unjust enrichment, a plaintiff must prove that "(1) the plaintiff conferred a benefit upon the defendant, (2) the defendant had knowledge of such benefit, and (3) the defendant retained the benefit under circumstances where it would be unjust for him to retain that benefit without payment*." Anchor Realty Constr., Inc. v. New Albany Links Golf Course*, No. 09AP–840, 2010 WL 5449847, at *4 (Ohio Ct. App. Dec. 23, 2010). Generally, a theory of unjust enrichment is not permitted when there is an express contract that governs the same subject matter. *Id.* This defense is available in cases that "involve contracts between the plaintiff and the party against whom unjust enrichment is asserted." *Id.* at *4–5 (finding that a plaintiff can maintain their unjust enrichment claim because they are not a party to the contract).

Defendants argue that there is no dispute as to the existence of an express contract between the parties, and therefore, the unjust enrichment claim cannot not prevail. (Doc. 86, PageID 2847.) While this is true between Activate Learning and SSC, Activate Learning/SASC's unjust enrichment claim is against Peyton individually, who is not a party to the contract.

> SSC represented to SASC that SSC was unwilling and/or unable to purchase [Open Science Education] Kits to fulfill SASC [Open Science Education] Kit orders and needed SASC to advance SSC funds in order to fulfill SASC's [Open Science Education] program obligations . . . . Based on those representations, SASC wired $1,330,000 to SSC's business checking account. . . . Peyton used his position of control as the sole owner of SSC and as the sole person with control of SSC's business checking account … to use the [Open Science Education] Advances for inappropriate personal expenses . . . . Peyton obtained an unjust, unauthorized

13

> benefit by taking personal control of the [Open Science Education]
> Advances, including by using the [Open Science Education]
> Advances for personal, non-business-related transactions including
> sports gambling, casino gambling, and crypto currency purchases,
> among others. Thus, Peyton has been unjustly enriched by his
> improper retention of the [Open Science Education] Advances; a
> retention that under the circumstances would be unjust for him to
> retain without payment. As a direct result of Peyton's retention,
> SASC has been damaged at least $1,111,210.19. . . .

(Doc. 76-1, PageID 1840-41.) Activate Learning has properly alleged its unjust enrichment claim.

In order to pierce the corporate veil in Ohio, the plaintiff must address the elements laid out in the *Belvedere-Dombrowski* test: "(1) control over the corporation by those to be held liable was complete; (2) control was exercised in such a manner as to commit fraud, an illegal act, or a similar unlawful act against the person seeking to disregard the corporate entity; and (3) injury or unjust loss resulted to the plaintiff from such control and wrong." *See Dombroski v. WellPoint, Inc.*, 895 N.E.2d 538, 545 (Ohio 2008); *see also Belvedere Condo. Unit Owners' Assn. v. R.E. Roark Cos., Inc.*, 67 Ohio St. 3d 274 (Ohio 1993). A complaint which recites the elements of the *Belvedere-Dombroski* test is sufficient to survive a motion to dismiss. *See Kurtz Bros. v. Ace Demo, Inc.*, 24 N.E.3d 649, 654 (Ohio Ct. App. 2014).

Defendants argue that Activate Learning cannot pierce the corporate veil and hold Peyton individually liable because it failed to allege any fraud, illegal act, or similarly unlawful act. (Doc. 86, PageID 2848.) The Court has previously held that Activate Learning's "allegations sufficiently allege a cause of action . . . against Peyton individually." (Doc. 77, PageID 1866.) "All counterclaims except the first counterclaim for breach of a contract to pay bonuses are dismissed." (*Id.* at 22.) Plaintiff recited each element of the *Belvedere-Dombroski* test to pierce the corporate veil for fraudulent transfer. (*Id.* at 5-9.) The same is true here. Plaintiff has alleged:

14

(1) Peyton, as owner and operator of SSC, had control over the corporation, (2) Peyton committed an unlawful act when he accessed SSC's advances from its business checking account for personal non-business-related transactions, and (3) injury and/or unjust loss resulted when Activate Learning suffered damages, including losses totaling approximately $1,111,210.19 as a direct result of the unlawful conduct by Peyton. (*See* Doc. 76-1; PageID 1840-41.) This satisfies the pleading requirements of the Ohio corporate veil piercing test, and therefore, the unjust enrichment count would withstand a motion to dismiss.

Defendants argue that Activate Learning's attempt to file an amendment and assert new claims is made in bad faith because the claims are contrary to the express contractual provisions in the agreement. (Doc. 86, PageID 2849.) Plaintiff's motion is supported by caselaw and each claim could survive a motion to dismiss. The proposed amended complaint was not made in bad faith. For the foregoing reasons, the Court will grant Activate Learning's Motion.

### D. Defendants' Amended Counterclaim for Breach of Contract

Also pending before the Court is Plaintiff's Motion to Dismiss Defendants' Amended Counterclaim. (Doc. 83.) Therein, Plaintiff asserts that SSC's Amended Counterclaim, (Doc. 79), simply restates its original Counterclaims that the Court has previously found deficient. (Doc. 83, PageID 2726.)

Defendant's Amended Counterclaim asserts a multi-part breach of a contract, beginning with breach of agreement to pay handling fees:

> Shipment times will drive the handling fees billed by SSC. If items fall into the 5-day shipment time the handling fee will be 9%, if items fall into the 30-day shipment time the handling fee will be 8% assessed. Handling fees will include ordering, receiving, picking, packing and shipment of items. Also included are shipping materials (boxes, totes, labels, bags, and other shipping materials) and standard ground shipping.

(Doc. 80-3, PageID 2223.)

Defendant posits that the Court should not resolve conflicting contract interpretations in a motion to dismiss. (Doc. 86, PageID 2842.)[1] Defendant's position presupposes conflicting reasonable interpretations; Ohio Courts routinely grant motions to dismiss when one party posits an unreasonable interpretation of a contract. *See, e.g., Miller Transportation, Inc. v. Hocking Athens Perry Cmty. Action*, 2024-Ohio-1017, ¶ 21-22, 2024 WL 1174452 (Ohio Ct. App. Mar. 19, 2024). Even at the Motion to Dismiss stage:

> the well-established rules of contract interpretation require that
> common words appearing in a written instrument are to be given
> their plain and ordinary meaning unless a manifest absurdity
> results or unless some other meaning is clearly intended from the

---

1 Defendant states: "Interpretation of the contract provisions at this stage is premature. *In re Nat'l Century Fin. Enters., Inc., Inv. Litig., supra.*" (Doc. 86, PageID 2842.) "*Supra*" Defendant listed its authority as, "*In re Nat'l Century Fin. Enters., Inc., Inv. Litig.*, No. 2:03-md-1565, 2006 U.S. Dist. LEXIS 72154 (S.D. E.D. Ohio)."

Local Rule demands, "All motions and applications tendered for filing shall be accompanied by a memorandum in support thereof that shall be a brief statement of the grounds, with citation of authorities relied upon." S.D. Ohio Civ. R. 7.2(a)(1). Unfortunately, unlike other jurisdictions, the local rule for the Southern District of Ohio does not expressly demand a pinpoint citation, possibly because the drafters expected members of the bar to know, "The central function of a legal citation is to allow the reader to efficiently locate the cited source." *The Bluebook: A Uniform System of Citation* Introduction, at 1 (Columbia Law Review Ass'n et al., 19th ed. 2010)). Indeed, the *Bluebook* instructs, "a case citation will tell the reader where the case can be found by listing: (1) the volume number of the reporter in which the case is listed; (2) the abbreviated name of the reporter…; and (3) the page on which the case report begins…[Y]ou must also include a **pinpoint citation**, often called a 'pincite." … Pincites are critical: they are the only means by which you can direct the reader to the exact page that contains the information or quotation on which you are relying for support." *Id.* B4.1.2, at 9 (emphasis in original). Citations to LEXIS and Westlaw cases take the form: "<case name>, <case docket number> (<court and fulldate parenthetical>)." *Id.* B4.1.4, at 11.

Defendants' failure to provide a full date of publication prevented the Court from finding the cited authority in Westlaw, as several decisions were docketed in that case in 2006. Once in LEXIS, the Court had little more success deciphering how this case supports Defendant's position, as Defendant does not here, or anywhere else in their Response, provide the Court a pinpoint citation. "Failing to pinpoint a reference can hurt a writer's credibility by making it hard, even impossible, to evaluate the validity of an argument or proposition. Good research is identified openly. Poor research is presented obscurely." Bryan A. Garner, *The Redbook: A Manual on Legal Style*, Rule 8.9, at 127 (2d ed. 2006). As one Court recently opined, "[j]udges are not like pigs, hunting for truffles…." *Murthy v. Missouri*, 144 S. Ct. 1972, 1991 n.7 (2024) (citation omitted). Counsel is **ADMONISHED** to provide pinpoint citations in future filings. Counsel is **GRANTED** 10 days from the filing of this opinion to file with the Court an addendum providing pinpoint citations for authorities in pending motions, responses, and replies. In future rulings, the Court will **DISREGARD** citations to caselaw that are not supported by the pinpoint citations. Should Counsel avail themselves of the privilege of filing an addendum, it shall consist solely of a list of: 1. Doc. Number and PageID on which the vague citation currently exists; 2. The corrected citation to include a pinpoint citation; 3. Quoted text that Counsel believes supports their proposition.

face or overall contents of the instrument. *Fireman's Fund Ins. Co. v. Mitchell Peterson, Inc.*, 578 N.E.2d 851, 855 (Ohio App. 1989). Where the terms in an existing contract are clear and unambiguous, a court cannot in effect create a new contract by finding an intent not expressed in the clear language employed by the parties. *Id.*

A latent ambiguity will be found where the language is clear and intelligible and suggests a single meaning, but some extrinsic fact or evidence creates the necessity for interpretation of a choice among two or more possible meanings. *Surber v. Woodruff*, 460 N.E.2d 1164, 1169 (Com. Pl. 1983); *see*, *also*, *Conkle v. Conkle*, 285 N.E.2d 883, 887–88 (Ohio Ct. App. 1972). However, if the language is clear and unambiguous it does not become ambiguous because, in its operation, it will work a hardship on one of the parties to the advantage of the other. *Seringetti Const. Co. v. City of Cincinnati*, 553 N.E.2d 1371, 1376 (1988)

By application of the foregoing, we hold that the trial court properly dismissed MetroHealth's complaint.

*MetroHealth Med. Ctr. v. Kaiser Found. Hosps.*, No. 64828, 1993 WL 277181, at *3–4 (Ohio

Ct. App. July 22, 1993).  Here, Defendants never shipped the items, and "shipments

times…drive the handling fees billed by SSC." (Doc. 80-3, PageID 2223.) Thus, Defendant

never earned the 8 or 9% handling fee, as the kits were never shipped.

Part two of the breach of contract claim is for fixed storage fees:

Plaintiff has not paid Defendant the required Storage fixed fee agreed upon in SOW No. 2 for April 2023, or the prorated amount for May 2023 in the amount of $13,225.81, in breach of SOW No. 2, and Defendant has incurred damages as a direct and proximate result of that breach in that amount.

(Doc. 79, PageID 1905, ¶ 71.) Fixed storage fees are addressed in the Statement of Work:

This SOW, made on January 1, 2021 ("SOW Effective Date") is attached and made a part of the Vendor Agreement dated on or about March 6, 2020 by and between SASC, LLC (DBA as Activate Learning) ("Company" or "SASC") and School Supply Connection, ("Contractor" or "SSC").

* * *

17

● Storage fixed fee $10K/month

(Doc. 80-3, PageID 2224.)

SSC's claim for storage fees for the books for the months of April and May is dispelled by SSC's own allegations. SSC seeks a fixed storage fee of $10,000 per month for April and May 2022, (Doc. 79, PageID 1904, ¶ 70), but also concedes that an Order of Possession was entered by the Court on April 3, 2023 and that the books were repossessed on April 10, 2023. (*Id.*, ¶ 61.) Activate Learning requested the return of the books as early as January 2023, but SSC refused, precipitating an *Ex Parte* Motion for Order of Possession. (Doc. 3.) So, like the Handling Fees, not only did SSC not perform and so failed to earn the Storage Fees because Activate Learning repossessed the books under storage in early April, it will also not be allowed to profit from its refusal to return the books to Activate Learning.

The next part of the breach of contract counterclaim is for failure to make prepayments for the unearned handling fees:

> 72. SOW No. 2, required Plaintiff to make prepayments to Defendant in the amount of $80,000.00 per month for the annual months of January through June. This prepayment is specified to "go against the annual handling fee calculated." Exhibit C, Bates No. SSCP000014.

> 73. Defendant continued to handle, specifically including but not limited to "picking, packing and shipment" of orders for Plaintiff through the termination and final fulfillment period ending May 10, 2023, and using its own shipping materials and shipping services which are also included in the contractual definition of "handling" to which these prepayments are to apply.

> 74. Plaintiff has not paid Defendant the required prepayments for January, February, March, or April 2023, in breach of SOW No. 2, and Defendant has sustained damages as a direct and proximate result of that breach in the amount of $320,000.00.

(Doc. 79, PageID 1904-05, ¶ 72-74.)

SSC seeks $320,000 in "prepayment," which it argues is "specified to 'go against the annual handling fee calculated.'" (Doc. 79, PageID 1904, ¶ 72 (citing Doc. 80-3, PageID 2224.)) However, as shown above, SSC isnot contractually entitled to any handling fee since it did not ship the books.

SSC seeks to recover both handling fees and the prepayment fees that exclusively go towards the handling fees. The prepayments serve to pay handling fees—fees not authorized by contract nor earned. (Doc. 79, PageID 1904, ¶ 72 (citing Doc. 2, PageID 2224.)) Even if the Vendor Agreement were not terminated and the parties' relationship continued on good terms, SSC would still not be entitled to both handling fees and a monthly prepay, as the prepay was for handling fees. For these reasons, this claim will be dismissed with prejudice.

SSC also asserts that Plaintiff breached the vendor agreement by failing to provide forecasts:

> 75. SOW No. 2 expressly requires Plaintiff to submit an "Official Monthly Forecast" each month to Defendant of the form set forth in Exhibit C of SOW No. 2. Exhibit C, Bates No. SSCP000015.
>
> 76. Pursuant to an amendment to the SOW No. 2 negotiated by authorized representatives of Plaintiff and Defendant, prepared by Plaintiff, signed by Eric Johnson, CEO, on behalf of Plaintiff, on July 21, 2021, and by Defendant Timothy Peyton, President, on behalf of Defendant, Defendant and Plaintiff also agreed as follows:
>
>> 1. This amendment adds a renewal option to the SOW which permits Plaintiff and Defendant to renew the agreement in increments of 2 years beginning when the current agreement ends
>>
>> 2. The amendment stipulates that Plaintiff will provide Defendant with an 18-month forecast for Open Sci Ed kits for planning purposes by August 15, 2021
>>
>> 3. All other terms and conditions remain in force from the Statement of Work dated January 1, 2021.

19

July 21, 2021, Agreement, Exhibit F, Bates No. SSCP000243.

77. Among its agreed provisions, SOW No. 2 Amend further obligates Plaintiff to provide Defendant an annual forecast for OSE kits for planning purposes by the end of February, with a resubmission through April of each year. Exhibit H, Bates No. SSCP000246.

78. SOW No. 2 and the July 21, 2021, agreement amendment between Plaintiff and Defendant required forecasts and 120 to 150 days lead time for the creation of kits from components. Exhibit C, Bates No. SSCP000015; Exhibit F, Bates No. SSCP000243.

79. Pursuant to SOW No. 2, as to lead times, Plaintiff and Defendant agreed as follows:

● When lead times are too short to get competitive pricing, Defendant will get approval to purchase at higher prices to ensure expected delivery dates are met. These increased costs will be absorbed by Defendant for the remainder of the year and all costs adjusted at the beginning of the next year to both adjust new costs and recognize increased costs from the previous year incurred. Exhibit C, Bates No. SSCP000016.

80. SASC did not provide Defendant the 180-day forecast requirement by the July 21, 2021, Agreement, or the annual or the monthly forecasts required by other agreements between them set forth herein and seldom, if ever, provided the required 120 to 150 days lead time, thus breaching the agreements between Plaintiff and Defendant.

81. The forecasts and lead times, if followed by Plaintiff, were intended by Plaintiff and Defendant to allow Defendant to purchase necessary kit components in a commercially advantageous manner, typically in bulk overseas supplier orders.

82. The failure of Plaintiff to provide Defendant required forecasts and provide 120 to 150 days lead times required Defendant to purchase components at substantially higher prices on short notice with approval of Plaintiff, thus increasing Defendant's cost of goods that exceeded 25% of the anticipated costs for components.

83. SOW No. 2 required Defendant to absorb such increased costs for the remainder of the year (2021) with all costs adjusted at the

20

> beginning of the next year to both adjust new costs and recognize
> increased costs from the previous year incurred.
>
> 84. Despite Plaintiff's agreement to pay these increased costs due
> to the short lead times and lack of forecasts, Plaintiff has not done
> so, and as a direct and proximate result of those breaches of the
> agreements between them, Defendant has sustained damages
> exceeding $673,669.80.

(Doc. 79, PageID 1905-07, ¶ 75-84.)

As stated by the Court in its previous order, "SSC and Peyton point to no language in the contract that obliged Activate Learning to make any purchases based upon forecasts." (Doc. 77, 1851.) Additionally, whatever price SSC paid for educational materials got passed on to Activate Learning, with SSC's mark up, negating any damages. Thus, the forecasts do not create any obligation or cognizable contractual claim.

SSC is claiming various breaches of contract, all for various alleged non-payments, and for which SSC has already invoiced Activate Learning. (See Doc. 80-10, PageID 2460-69.) While Activate Learning disputes SSC's entitlement to any of those payments and disputes those invoices, were SSC to succeed on those claims, its remedy would be subsumed in those respective awards. Importantly, SSC has not alleged any performance on its part that mandates payment under the contract of any of the invoices. Claiming non-payment of disputed invoices in addition to claiming for payment of the charges reflected on those invoices is duplicative.

Moreover, in addition to its invoices for handlings fees, storage fees, prepayments, zero charge orders, and a 10% price increase, SSC seeks to charge Activate Learning for "interest and other expenditures." However, SSC points to nothing in the agreement entitling it to recover for "interest and other expenditures" related to validly disputed invoices.

Finally, the Limitation of Liability clause in the Vendor Agreement explicitly proscribed claiming "indirect, incidental, special, consequential, exemplary, contingent, collateral, or

21

punitive damages (including lost profits, lost revenue or lost savings)." (Doc. 80-1, PageID 2213.) Because interest is a consequential damage, *Firwood Mfg. Co. v. Gen. Tire, Inc.*, 96 F.3d 163, 165 (6th Cir. 1996) (Kennedy, J.) ("sellers are entitled to receive incidental, but not consequential, damages and interest is a consequential damage."), SSC's claim is precluded by the Vendor Agreement.

Defendant counters that "the invoice nonpayment issue goes far beyond those invoiced issues and addresses the many invoices Activate Learning never timely paid as required by the cited contract provisions." (Doc. 86, PageID 2844.) Defendant does not bother itself to clarify for the Court what the "cited contract provisions" might be, beyond telling the Court to re-read the entire "Invoice Nonpayment" subclaim. (*Id.*; Doc. 79; PageID 1907-08.) Mere presentation of invoices is insufficient to prove damages when the invoices are not self-explanatory as to work done or reasonableness of charges. *In re Northup-Johnson, Inc.*, 15 B.R. 767, 770 (Bankr. D. Md. 1981); *see also In Re Howarth Estate*, 310 N.W.2d 255 (Mich. Ct. App. 1981)("mere presentation of invoices is insufficient to prove work done and reasonableness of charges.").

"The elements of a breach of contract claim are the existence of a contract, performance by the plaintiff, breach by the defendant, and damage or loss to the plaintiff." *Becker v. Direct Energy, LP*, 112 N.E.3d 978, 988 (Ohio Ct. App. 2018) (cleaned up). To allege a "plausible [counter-]claim for relief," Defendant must allege facts sufficient to provide a plausible basis for concluding that each element has been met. *Iqbal*, 556 U.S. at 679; *Darby v. Childvine, Inc.*, 964 F.3d 440, 444 (6th Cir. 2020) ("At this stage, we consider whether the complaint states a claim for relief that is plausible, when measured against the elements of [the] ... claim."). Alleging only that (1) the contract covered the alleged claims, and (2) that Defendant breached the contract by denying the claim and failing to pay, is insufficient to state a claim for breach of contract. *Duff v.*

*Centene Corp.*, 565 F. Supp. 3d 1004, 1019 (S.D. Ohio 2021) (citing *Timber Pines Plaza, LLC v.*

*Kinsale Ins. Co.*, No. 8:15-CV-1821-T-17TBM, 2016 WL 8943313, at \*2 (M.D. Fla. Feb. 4,

2016) ("[I]t is not sufficient under Iqbal to merely plead that the Defendant breached the Policy

by failing to pay the benefits owed under the Policy."); *Wohl Built, Inc. v. Maxum Indem. Co.*,

No. 17-CV-80867, 2017 WL 10410373, at \*2 (S.D. Fla. Dec. 21, 2017)).

Because it is unclear just what nonpayment issues "far beyond those invoiced issues"

Defendant refers to, Defendant has failed to meet even the first element of a breach of contract

claim with regard to the alleged breaches the Court has already determined to dismiss.

Next, Defendant claims Plaintiff violated a contractual provision of exclusivity:

> 90. In addition to monetary compensation, SOW No. 2 also
> provided for exclusivity pursuant to the following terms:
> Exclusivity Updated This is an exclusive fulfillment agreement.
> Defendant will fulfill orders for the following programs on behalf
> of PLAINTIFF: IQWST, AL PRIME, Science Companion, Active
> Physics, Active Chemistry, Active Physical Science, EarthComm,
> Engineering the Future, IMP, MM, other High School titles,
> NGPET, other college titles and PBIScience.
>
> • The term of exclusivity for all products terminates Dec 31, 2024.
> Exhibit C, Bates No. SSCP000014.
>
> 91. Despite SOW No. 2's provision providing for an exclusive
> fulfillment agreement agreed to by Plaintiff and Defendant as an
> incentive to Defendant to continue with its services for Plaintiff,
> Plaintiff used other fulfillment companies in breach of this
> agreement.
>
> 92. Plaintiff's breach of the exclusivity term of the agreement with
> Defendant directly and proximately resulted in damage to
> Defendant in the form of lost profits exceeding $25,000.00.

(Doc. 79, PageID 1909.)

This is insufficient. *See Caribbean Airmail, Inc. v. Norjay Enterprises, L.L.C.*, No. 09-

21478-CIV, 2009 WL 10698789, at \*3 (S.D. Fla. July 21, 2009) ("To the extent the breach

concerns the exclusivity clauses, [plaintiff] has alleged no facts about how defendants have breached the clauses. In sum, although the Amended Complaint makes clear that defendants are alleged to have breached the Agreements, it is far from clear what defendants are alleged to have done (or not done) to breach them. Simply put, [plaintiff] must '*show*[ ] that [it] is entitled to relief' Fed. R. Civ. P. 8(a)(2) (emphasis added), not merely assert that it is"); *Vista Food Exch., Inc. v. Champion Foodservice, LLC*, 124 F. Supp. 3d 301, 311 (S.D.N.Y. 2015)(Sweet, J.) ("allegations that BC & G violated the exclusivity agreement amount to two sentences, one stating that it purchased products directly from Vista's suppliers, and another stating that this violated the putative oral agreement. Although a claim does not require detailed factual allegations to survive a motion to dismiss, it requires more than this; a complaint will not 'suffice if it tenders naked assertions devoid of further factual enhancement'").

Next, Defendant asserts that the original agreement was orally modified to include a 10% price increase that Plaintiff allegedly failed to pay. SSC cites to emails that allegedly confirm an oral agreement. (*See* Doc. 79, PageID 1909, ¶ 93-95.)

However, the Agreement expressly provides that:

> This Agreement may be supplemented, amended or revised only in a writing signed by both parties. . . This Agreement sets forth the entire agreement between the parties with respect to the subject matter hereof, and supersedes all other agreements, representations, proposals and other prior or contemporaneous writings, correspondence or communications with respect to the subject matter hereof, both written and verbal.

(Doc. 80-1, PageID 2214.) An email that evinces an oral agreement is not "a writing signed by both parties." Because SSC fails to allege the existence of a modified contract, this claim will be dismissed. *Robinson*, 2007 WL 162490 at *2.

Finally, SSC asserts that Activate Learning failed to pay Zero Charge Orders:

96. SOW No. 2 provided as follows with respect to returns from Plaintiff's customers:

- Upon receipt in [SSC's] warehouse, returns from a customer in acceptable condition will be credited back to SASC at cost within a 30-day period. If this deadline is not adhered to SSC will credit back full retail of the transaction to SASC. Exhibit C, Bates No. SSCP000015.

97. Defendant was thus obligated to respond to customer order issues if the issues were raised within thirty (30) days of shipment but not outside that window of time, and these orders were known as "Zero Charge Orders".

98. Plaintiff represented to Defendant that many customer returns were in the 30-day window, and Defendant justifiably relied on those representations, but many such customer order returns were well in excess of the thirty (30) days limit.

99. Upon its own internal review following Plaintiff's notice of termination of the subject agreement, Defendant determined that it incorrectly paid $32,816.62 in such improper Zero Charge Orders that were credited in reliance upon Plaintiff's misrepresentations to Defendant that returned customer orders were returned within that thirty[-]day time limit.

100. Plaintiff's false or inaccurate representations breached the agreement with Defendant, and as a direct and proximate result of that breach, Defendant sustained damages in amount in excess of $32,781.62.

101. The multiple above-described breaches by Plaintiff of the agreements which are the subject of this Counterclaim directly and proximately caused damage to Defendant in an amount in excess of $2,000,000.00.

(Doc. 79, PageID 1909-10.)

While this claim appears plausible at first glance, nothing in the Vendor Agreement obligates Activate Learning to "respond to customer order issues if the issues were raised within thirty (30) days of shipment but not outside that window of time," as SSC claims. (Doc. 80-1, PageID 1909.) The provision SSC cites does not impose any obligation on Activate Learning.

25

Indeed, it states "SSC will credit back full retail of the transaction to [Activate Learning]." (Doc. 80-1, PageID 1909.) Additionally, the provision provides that returns from customers are received in SSC's warehouse, thus making SSC the only party with visibility on the timing of customer returns. *Id.* This obviates any "justifiable reliance" on the part of SSC. Thus, there is no contractual basis for this claim, and it will be dismissed.

### E. Defendant's Wrongful Attachment Counterclaim

Plaintiff seeks to dismiss Defendant's second counterclaim, which is for wrongful attachment, asserting it is both a retaliatory claim precluded by the *Noerr-Pennington* Doctrine, and not ripe. The *Noerr-Pennington* Doctrine provides immunity from liability for claims based on a party's efforts to petition governmental agencies for official action. *VIBO Corp., Inc. v. Conway*, 669 F.3d 675, 683-84 (6th Cir. 2012). The *Noerr-Pennington* Doctrine is "based on the right to seek redress in the courts," and ensures that a party will "not be subjected to liability for its attempt to have its rights protected by the courts unless that attempt is shown to have been a mere 'sham.'" *Melea Ltd. v. Quality Models, Ltd.*, 345 F. Supp. 2d 743, 758 (E.D. Mich. 2004); *see also Harvey v. Great Seneca Fin. Corp.*, 453 F.3d 324, 326 (6th Cir. 2006) (*Noerr-Pennington* "protects litigants who seek redress of wrongs through judicial proceedings"). The sham litigation exception to the *Noerr-Pennington* Doctrine withholds immunity from suit when petitioning conduct is a "mere sham to cover what is actually nothing more than an attempt to interfere directly with the business relationships of another." *Eastern R. Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 144 (1961). There is a similar litigation privilege under Ohio law. *See J.M. Smucker Co. v. Hormel Food Corp.*, 526 F. Supp. 3d 294, 308 n.14 (N.D. Ohio 2021) (recognizing that Ohio's litigation privilege is consistent with the *Noerr-Pennington* Doctrine).

While the doctrine has "its roots in antitrust law,…the federal courts have by analogy applied it to claims brought under both state and federal laws," to immunize plaintiffs from retaliatory claims by defendants. *J.M. Smucker*, 526 F. Supp. 3d at 308. Here, Count 2 of the Amended Counterclaim is premised on Activate Learning's initiation of this lawsuit, (*see* Doc. 79, PageID 1910, ¶¶ 102-26), and thus, is retaliatory and barred by the *Noerr-Pennington* Doctrine. *See e.g.*, *J.M. Smucker Co.*, 526 F. Supp. 3d at 310 (applying *Noerr-Pennington* Doctrine to dismiss claims that were based on the filing of lawsuit); *Gemperline v. Franano*, 199 N.E.3d 587, 593 (Ohio Ct. App. 2022) (dismissing claim for abuse of process under *Noerr-Pennington* Doctrine).

Under Ohio precedent, no attachment is alleged here. In similar circumstances, where the plaintiff brought a claim for wrongful attachment, but the property was "not actually taken into the custody of the officer levying the writ," the Ohio Supreme Court found that an essential element of a claim for wrongful attachment, is an attachment. *Fredritz v. Hartman*, 150 Ohio St. 493, 497 (1948). Here, as in *Fredritz*, no property has been attached. *See In re Tibbetts*, 869 F.3d 403, 406 (6th Cir. 2017) ("A claim is unripe when 'the events giving rise to the claim had not yet occurred'" (citing *In re Jones*, 652 F.3d 603, 605 (6th Cir. 2010)).

The allegations in the amended counterclaim describe a situation where the attachment remains incomplete pending an "inventory and appraisement, with individual pallets and the contents thereof being individually videotaped, categorized, counted, and valued…." (Doc. 79, PageID 1899.) This delay exists because of SSC's refusal—in breach of the Agreement— to provide the annual full physical count of the non-textbook school supply inventory. (*See* Doc. 76-1, ¶¶ 23-26.) Without this inventory, which is SSC's contractual obligation to provide and the

United States Marshal's responsibility to verify and inventory, no attachment can be had. (Doc. 9, PageID 274.) Thus, this claim will be dismissed because it is not ripe.

Moreover, SSC has separately moved to discharge the Magistrate Judge's Order of Attachment. (Doc. 10, 23.) After briefing and an evidentiary hearing on the matter, the Magistrate Judge issued an order denying SSC's discharge motion and finding by a preponderance of the evidence that probable cause existed for her Order of Attachment. (Doc. 35.) SSC filed an objection to Magistrate Judge Gentry's order, (Doc. 42), which this Court overruled. (Doc. 62.) This count is in effect an improper attempt to relitigate an issue already litigated. This further supports dismissal of SSC's wrongful attachment claim. Thus, Count 2, which is premised on Activate Learning's filing of the lawsuit and pursuing the attachment of the educational materials it claims, is retaliatory and barred by the *Noerr-Pennington* Doctrine.

### F. Defendant's Counterclaim for Promissory Estoppel

To state claim for promissory estoppel, Defendants must allege: "[1] 'a clear and unambiguous promise'; [2] 'reliance on the promise'; [3] 'reliance is reasonable and foreseeable'; and [4] 'the relying party was injured by his or her reliance.'" *Holmes v. Wilson*, No. 2:08-CV-602, 2009 WL 3673015, at *4 (S.D. Ohio Oct. 30, 2009). However, "Ohio law bars a promissory estoppel claim when there is an express contract between the parties." *Loadman Grp., L.L.C. v. Banco Popular N. Am.*, No. 4:10-cv-1759, 2013 WL 1150125, at *9 (N.D. Ohio Mar. 19, 2013). *Loadman*, upon which SSC relies, granted summary judgment.

Here, SSC contests whether their actions are governed by an express contract. When the question of whether an express agreement governs the issue in dispute remains unresolved, a plaintiff is free to state her claims in the alternative. *Miranda v. Xavier Univ.*, 594 F. Supp. 3d 961, 975 (S.D. Ohio 2022).

However, the Counterclaim asserts:

> 129. Plaintiff made representations to Defendant that it would engage in a business relationship with Defendant if, among other things, Defendant agreed, at its own expense, to integrate its IT business management system with that of Plaintiff to be utilized in the course of that relationship.

> 130. At the time these representations and promises were made, Plaintiff had no intention of complying with those representations.

> 131. In particular, Plaintiff failed to establish, maintain or update its end of the IT business management system so that it would integrate with Defendant's portion of the IT business management system.

> 132. Defendants reasonably and justifiably relied upon the representations of Plaintiff, with which they had a history and course of dealing expanding over the past 13 years.

> 133. Plaintiff had no intention of continuing that business relationship despite being aware of the sizeable expenses in time, money and effort Defendant was incurring to establish that IT system, and in fact terminated the agreement with Defendant before the IT system integration could be accomplished.

> 134. In justifiable reliance on Plaintiff's representations, Defendant incurred IT system integration expenses in the amount of $201,956.25 which were reasonably foreseeable to Plaintiff in light of the extent of the integration project, but the agreement was terminated by Plaintiff before the integration was accomplished, leaving Defendant with the expense of an incomplete system that is otherwise useless in its own operations.

> 135. Plaintiff and Defendant communicated about these representations, and Defendant reasonably and justifiably relied on Plaintiff's promise to perform in that manner and engage in its business relationship with Defendant, and as a direct and proximate result of that reliance, Defendant was damaged in an amount in excess of $201,956.25 as it related to the system integration.

(Doc. 79, PageID 1915-16.)

Ohio law does not generally permit recovery under the theory of promissory estoppel when an express contract covers the same subject matter. *Bunta v. Superior VacuPress, L.L.C.*, 218 N.E.3d 838, ¶ 36 (Ohio 2022). The equitable doctrine does not supply an implied contractual relationship between parties who have reached an express contractual agreement. *Id.* at ¶ 39.

While the Court previously opined that Defendants should be able to pursue an alternative equitable claim, they have not done so. Both parties allege that the contract here unequivocally requires "Any waiver shall be in writing signed by the party granting the waiver. This Agreement may be supplemented, amended or revised only in a writing signed by both parties." (Doc. 81-1, PageID 2214.) The parties expressly agreed to an arrangement not susceptible to equitable remedies.

### G. Defendants' *Quantum Meruit* Counterclaim

Finally, SSC purports to bring a claim for *quantum meruit*. To allege a claim for qua*ntum meruit*, a party must assert that: (1) SSC conferred a benefit on Activate Learning; (2) Activate Learning knew of the benefit; and (3) it would be unjust for Activate Learning to retain the benefit without payment. *Fox Consulting Grp., Inc. v. Mailing Servs. of Pittsburgh, Inc.*, No. C-210250, 2022 WL 1100528, at *2 (Ohio Ct. App. Apr. 13, 2022).

Just as with Count 3, "Ohio law does not allow parties to seek damages under quasi-contractual theories of recovery . . . when a contract governs the relationship." *Cook v. Home Depot U.S.A., Inc.*, No. 2:06-CV-00571, 2007 WL 710220, at *8 (S.D. Ohio Mar. 6, 2007). Notwithstanding the controlling case law, SSC expressly alleges that their *quantum meruit* claim is based on the "contracts and agreements between [Activate Learning and SSC]," (Doc. 79, PageID 1917, ¶ 140), and incorporate the remaining allegations relating to those "contracts and

agreements" (including purported breaches thereof) into the Count. (*See id*. ¶ 139 (incorporating all allegations in the Counterclaim into Count 4)).

Even if the express contract did not foreclose equitable remedies, there is no allegation in the Amended Counterclaim of any services provided by anyone to Activate Learning outside of those under the alleged express contract between Activate Learning and SSC and thus the Vendor Agreement exclusively governs the Parties' relationship here. SSC uses the same allegation here as it does in its promissory estoppel claim. It claims SSC had expenditures expanding its IT "business management systems" and should be reimbursed for those. (*Id.* ¶ 144.) However, considering SSC alleges the business management systems were never actually integrated, SSC never conferred a benefit on Activate Learning and thus this claim fails on the first prong of a *quantum meruit* count. *See Fox Consulting Grp., Inc*, 2022 WL 1100528 at *2. SSC's *quantum meruit* claim for the handling fees related to the repossessed books subject to its Count I breach of contract claim fails because that claim is governed by contract. *See Cook*, 2007 WL 710220 at *8. Therefore, Count 4, fails to state a claim on which relief can be granted and will be dismissed as well. *Ruggles v. Bulkmatic Transp. Co*., No. C2-03-617, 2004 WL 5376213, at *6 (S.D. Ohio June 23, 2004) (dismissing *quantum meruit* claim because express contract governed the subject matter of the claim).

## IV. Conclusion

Because Plaintiff's proposed amendments would survive a motion to dismiss, the Court **GRANTS** Plaintiff's motion for leave to file Amended Complaint. (Doc. 76.) Because Defendant has failed to allege a cause of action against Plaintiff the Court **GRANTS** plaintiff's Motion to Dismiss Defendants' Amended Counterclaim, (Doc. 83), and finally, as noted in footnote 1, page 16, *supra*, because the Court will not countenance briefing unsupported by

proper citations, the Court **GRANTS** Defendants ten days to file an addendum to memoranda relating to pending motions, including Doc. 63, PageID 1700 and Doc. 78, PageID 1874, that provides pinpoint citations that support Defendants' assertions in those pending motions.

      **DONE** and **ORDERED** in Dayton, Ohio, this Thursday, August 15, 2024.

s/Thomas M. Rose

_____
THOMAS M. ROSE
UNITED STATES DISTRICT JUDGE